**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SUSAN CHRISTENSEN, VICTORIA STILZ, WILLIAM EHLERS, CHEYENNE HAUSER, ANGELIKA KNOEBL, NATASHA HEIDLAGE, CASSIDY DEELY, and GLENN LEE, | ) ) ) ) ) ) | |
| individually and on behalf of all others similarly situated, | ) ) ) | Case No. 1:20-cv-01813 |
| | ) | Hon. Robert W. Gettleman |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| THE BOEING COMPANY, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT THE BOEING COMPANY'S MOTION TO DISMISS THE COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(1), 12(B)(6), AND 9(B)**

Michael B. Slade (6274231)
Allison A. Ray (6309970)
Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
(312) 862-2000

Craig S. Primis, P.C.
Ronald K. Anguas, Jr.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000

*Attorneys for Defendant
The Boeing Company*

# **TABLE OF CONTENTS**

**Page**

Table of Authorities ............................................................................................................ ii

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 4

LEGAL STANDARD.......................................................................................................... 6

ARGUMENT ...................................................................................................................... 6

**I.**     Plaintiffs' Claims Fail For Lack Of Proximate Cause. ........................................... 6

**II.**    Plaintiffs Fail To Plead The Requisite Elements Of Tortious Interference. .................... 12

**III.**   Plaintiffs' Fraud Allegations Fail Under Illinois Law and Rule 9(b). ............................ 15

**IV.**   Plaintiffs' Fraud By Non-Disclosure Claim Separately Fails Because Boeing Does Not Have A Fiduciary Or "Extremely Similar" Relationship With Flight Attendants. ............................................................................................................ 19

**V.**    The Economic Loss Doctrine Bars Plaintiffs' Negligence Claims................................. 21

**VI.**   Plaintiffs' Claims Are Preempted By The Railway Labor Act........................................ 24

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abazari v. Rosalind Franklin Univ. of Med.*,
 40 N.E.3d 264 (Ill. App. Ct. 2015) ..........................................................................16

*Air Line Pilots Ass'n v. UAL Corp.*,
 897 F.2d 1394 (7th Cir. 1990) ...................................................................................13

*Al Maha Trading & Contracting Holding Co. v. W.S. Darley & Co.*,
 936 F. Supp. 2d 933 (N.D. Ill. 2013) ........................................................................19

*Am. Guardian Warranty Servs. v. Auto Prot. Corp.*,
 2019 WL 6130813 (N.D. Ill. Nov. 19, 2019) ............................................................12

*Anderson Elec. v. Ledbetter Erection Corp.*,
 503 N.E.2d 246 (Ill. 1986) ........................................................................................21

*Aquino v. C.R. Bard, Inc.*,
 413 F. Supp. 3d 770 (N.D. Ill. 2019) ........................................................................11

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ........................................................................................6, 12, 15

*Avery v. State Farm Mut. Auto. Ins. Co.*,
 835 N.E.2d 801 (Ill. 2005) ........................................................................................16

*Baylis v. Marriott Corp.*,
 906 F.2d 874 (2d Cir. 1990) .............................................................................4, 24, 25

*Belden Corp. v. InterNorth, Inc.*,
 413 N.E.2d 98 (Ill. App. Ct. 1980) ...........................................................................13

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) .....................................................................................................6

*Benner v. Bell*,
 602 N.E.2d 896 (Ill. App. Ct. 1992) ..........................................................................11

*Benson v. Stafford*,
 941 N.E.2d 386 (Ill. App. Ct. 2010) ..........................................................................20

*Boffa Surgical Grp. LLC v. Managed Healthcare Assocs.*,
 47 N.E.3d 569 (Ill. App. Ct. 2015) ............................................................................14

*C&K Nuco, LLC v. Expedited Freightways, LLC,*
 2016 WL 3364766 (N.D. Ill. June 17, 2016) ........................................................17

*Cancer Found., Inc. v. Cerberus Capital Mgmt., LP,*
 559 F.3d 671 (7th Cir. 2009) .................................................................................5

*In re Chicago Flood Litig.,*
 680 N.E.2d 265 (Ill. 1997) ...........................................................................21, 22

*City of Chicago v. Beretta U.S.A. Corp.,*
 821 N.E.2d 1099 (Ill. 2004) ................................................................................2, 6

*Connick v. Suzuki Motor Co., Ltd.,*
 675 N.E.2d 584 (Ill. 1996) ...............................................................................3, 20

*Crichton v. Golden Rule Ins. Co.,*
 576 F.3d 392 (7th Cir. 2009) ...............................................................................19

*Cty. of Cook v. Philip Morris,*
 817 N.E.2d 1039 (Ill. App. Ct. 2004) .........................................................9, 10, 11

*D&K Props. Crystal Lake v. Mut. Life Ins. Co.,*
 1996 WL 224517 (N.D. Ill. May 1, 1996) ............................................................14

*Dundee Cement Co. v. Chem. Labs, Inc.,*
 712 F.2d 1166 (7th Cir. 1983) ...............................................................................9

*E. River S.S. Corp. v. Transamerica Delaval, Inc.,*
 476 U.S. 858 (1986)...............................................................................................22

*Film & Tape Works, Inc. v. Junetwenty Films, Inc.,*
 856 N.E.2d 612 (Ill. App. Ct. 2006) .....................................................................13

*First Midwest Bank, N.A. v. Stewart Title Guar. Co.,*
 823 N.E.2d 168 (Ill. App. Ct. 2005) .....................................................................23

*First Springfield Bank & Tr. v. Galman,*
 720 N.E.2d 1068 (Ill. 1999) ..............................................................2, 11, 15, 22

*Flynn v. FCA US LLC,*
 327 F.R.D. 206 (S.D. Ill. 2018) .......................................................................3, 20

*Go For It, Inc. v. Aircraft Sales Corp.,*
 2003 WL 21504600 (N.D. Ill. June 27, 2003)......................................................20

*Hawaiian Airlines, Inc. v. Norris,*
 512 U.S. 246 (1994).............................................................................................25

*HPI Health Care Servs. v. Mt. Vernon Hosp., Inc.*,
    545 N.E.2d 672 (Ill. 1989) ........................................................................................12

*In re Ill. Bell Switching Station Litig.*,
    641 N.E.2d 440 (Ill. 1994) ........................................................................................21

*Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris
    Inc.*,
    196 F.3d 818 (7th Cir. 1999) .....................................................................................10

*Intl'l Union, United Mine Workers of Am. v. Covenant Coal Corp.*,
    977 F.2d 895. (4th Cir. 1992) ....................................................................................24

*Jett8 Airlines, PL v The Boeing Co.*,
    2012 WL 5815728 (Ill. Cir. Ct. Nov. 02, 2012) .......................................................23

*Kaufman v. Allied Pilots Ass'n*,
    274 F.3d 197 (5th Cir. 2001) .....................................................................................24

*Kraft Chem. Co. v. Ill. Bell Tel. Co.*,
    608 N.E.2d 243 (Ill. App. Ct. 1992) ...........................................................................9

*Lewis v. Lead Indus. Ass'n*,
    793 N.E.2d 869 (Ill. App. Ct. 2003) ...........................................................................6

*McMahan v. Deutsche Bank AG*,
    938 F. Supp. 2d 795 (N.D. Ill. 2013) .......................................................................18

*In re Midway Games, Inc. Sec. Litig.*,
    332 F. Supp. 2d 1152 (N.D. Ill. 2004) ......................................................................10

*Miller v. Sw. Airlines Co.*,
    926 F.3d 898 (7th Cir. 2019) ..............................................................................4, 24

*Milne Emps. Ass'n v. Sun Carriers*,
    960 F.2d 1401 (9th Cir. 1991) ..................................................................................24

*Monroe v. Missouri Pac. R. Co.*,
    115 F.3d 514 (7th Cir. 1997) ......................................................................................4

*Moorman Mfg. Co. v. Nat'l Tank Co.*,
    435 N.E.2d 443 (Ill. 1982) ............................................................................3, 21, 23

*Orchard Park Plaza, LLC v. Chubb Custom Ins.*,
    2018 IL App (1st) 172526-U .....................................................................................21

*Phillips v. DePaul Univ.*,
    19 N.E.3d 1019 (Ill. App. Ct. 2014) ..............................................................6–8, 10, 12, 18

*Premier Transport, Ltd. v. Nextel Commc's, Inc.*,
   2002 WL 31507167 (N.D. Ill. Nov. 12, 2002) ....................................................14

*Rankow v. First Chicago Corp.*,
   870 F.2d 356 (7th Cir. 1989) ........................................................................23

*Reid v. Harvey Motorcycle & Camper*,
   2007 WL 4277435 (N.D. Ill. Nov. 30, 2007) ....................................................18

*Robins Dry Dock & Repair Co. v. Flint*,
   275 U.S. 303 (1927).....................................................................................21

*Roman v. Delta Air Lines*,
   441 F. Supp. 1160 (N.D. Ill. 1977) ......................................................9, 10, 17

*Rubloff Dev. Grp. v. SuperValu, Inc.*,
   863 F. Supp. 2d 732 (N.D. Ill. 2012) ............................................................15

*Shermer Aviation, LLC v. Dassault Falcon Jet Corp.*,
   2014 IL App (1st) 131400-U ..........................................................................18

*Strosberg v. Brauvin Realty Servs.*,
   691 N.E.2d 834 (Ill. App. Ct. 1998) ..............................................................14

*Thompson v. Am. Airlines Grp.*,
   128 F. Supp. 3d 1047 (N.D. Ill. 2015) .......................................................4, 24

*Tolan & Son, Inc. v. KLLM Architects, Inc.*,
   719 N.E.2d 288 (Ill. App. Ct. 1999) ..............................................................23

*Toulon v. Cont'l Cas. Co.*,
   877 F.3d 725 (7th Cir. 2017) ........................................................3, 15, 17, 19

*Trans States Airlines v. Pratt & Whitney Canada, Inc.*,
   682 N.E.2d 45 (Ill. 1997) .........................................................................4, 22

*Webb v. Frawley*,
   906 F.3d 569 (7th Cir. 2018) ..............................................................2, 13, 14

*Westfield Ins. Co. v. Birkey's Farm Store*,
   924 N.E.2d 1231 (Ill. App. Ct. 2010) ............................................................21

*Wigod v. Wells Fargo Bank, N.A.*,
   673 F.3d 547 (7th Cir. 2012) ...........................................................3, 19–21, 23

*Willcutts v. Galesburg Clinic Ass'n*,
   560 N.E. 2d 1 (Ill. App. Ct. 1990) ................................................................14

**Statutes**

Railway Labor Act, 45 U.S.C. § 181 ................................................................................24

**Rules**

Fed. R. Civ. P. 9(b) .....................................................................................3, 15, 18, 19

Fed. R. Civ. P. 12(b)(1)..................................................................................................25

## INTRODUCTION

Plaintiffs are Southwest Airlines flight attendants seeking lost wages and other damages they allege to have suffered due to the grounding of Boeing's 737 MAX aircraft in 2019. They raise claims of fraudulent concealment, fraudulent misrepresentation, tortious interference, negligence, and negligent misrepresentation. But Plaintiffs do not allege that they were injured in any accident, or that they were in privity with Boeing. Indeed, they do not allege that they had any direct communication with Boeing at all. Plaintiffs instead bring claims solely as employees of one of Boeing's airline customers alleging that, when they negotiated and entered into a collective bargaining agreement with Southwest *in 2013*, they relied on four Boeing press releases announcing the early stages of the 737 MAX's development. Plaintiffs' claims fail because the critical events that led to the grounding of the 737 MAX all post-date formation of the 2013 CBA; as a result, most of the allegations in the complaint are completely irrelevant both to SWAFA's decision to enter into that CBA and to Boeing's state of mind when it made the statements. And the few allegations and alleged misstatements that actually precede SWAFA's 2013 CBA do not substantiate any of the claims Plaintiffs seek to bring in this case.

The crux of Plaintiffs' claims is that Boeing defrauded them and intentionally interfered with their CBA by issuing press releases in 2011 and 2012 stating that the "737 is the world's most popular and reliable commercial jet transport" and that the 737 MAX would include a "new engine variant" that "builds on the strengths" of the 737, Compl. ¶¶ 51-52, without *also* "disclos[ing] the full scope of differences between the [predecessor] 737 NG and the 737 MAX," *id.* ¶ 55. But as Plaintiffs themselves allege, the press releases on which they base their claims—bare statements issued to the general public that allegedly induced Plaintiffs to enter into the 2013 CBA—were issued long before final design, development, and certification of the 737 MAX was complete. It is therefore a logical impossibility that those press statements could be shown to be knowingly

1

false based on events that occurred years later. Plaintiffs' claims are far too attenuated, and each fails under settled Illinois and Seventh Circuit law.

*First*, Plaintiffs cannot establish proximate cause for any of their claims as a matter of law. Proximate cause requires that a defendant's misconduct be (i) a "but-for" cause of a plaintiff's alleged injury; and (ii) a "legal" cause of that injury, meaning that the alleged misconduct is sufficiently connected to the injury to impose liability. *See, e.g.*, *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1128 (Ill. 2004). Plaintiffs' allegations fail at both steps. For one thing, Plaintiffs' implausible theory of causation assumes they relied on Boeing's misrepresentations and omissions regarding specific design features of the 737 MAX during their union's negotiations with Southwest in 2012 and 2013—*before* Boeing had even finalized the design of the airplane. Plaintiffs cannot show but-for causation in light of this timeline. Nor can Plaintiffs establish legal causation—they cannot tie lost wages purportedly associated with the 737 MAX grounding in 2019 to press releases issued in 2011 and 2012. Plaintiffs' causal chain is far too lengthy, and Illinois and Seventh Circuit law prohibit claims for such remote and unforeseeable harms.

*Second*, Plaintiffs' tortious interference claims fail because Plaintiffs have not pleaded—and cannot plead—that Boeing intended to cause a breach of their CBA or business relationship with Southwest when it issued the identified press releases, or that such a breach ever occurred. *See, e.g.*, *Webb v. Frawley*, 906 F.3d 569, 579 (7th Cir. 2018). General statements in Boeing's press releases are not the type of intentional misconduct required to plead tortious interference. *See id.* And Plaintiffs each still fly for Southwest under the 2013 CBA today, undermining any claim of breach. Plaintiffs' tortious interference claims therefore fail as a matter of law.

*Third*, Plaintiffs fail to plausibly allege the requisite elements of fraud under Illinois law. Plaintiffs assert that Boeing made generalized misrepresentations "to Stakeholders and the public,"

citing press releases issued in 2011 and 2012. But Plaintiffs do not and cannot allege that any of these statements were false, that they were made with an intent to induce Plaintiffs to enter into their 2013 CBA, or that Plaintiffs actually relied on them when deciding to enter into that CBA. *See Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 734 (7th Cir. 2017). These failures of pleading are fatal to Plaintiffs' fraud claims. And to the extent Plaintiffs seek to rely on statements beyond the four press releases, their allegations lack the particularity required by Rule 9(b). *See id.*

*Fourth*, Plaintiffs' fraud by non-disclosure claim fails for the independent reason that Plaintiffs and Boeing do not share the fiduciary or "extremely similar" relationship required to establish a duty to disclose under Illinois law. *See, e.g.*, *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 568–69 (7th Cir. 2012). Plaintiffs do not plead a fiduciary relationship at all and instead stake their fraud allegations on Boeing's alleged duty to "Stakeholders and the public." Compl. ¶ 349. But no Illinois authority supports such an expansive reading of the necessary relationship. To the contrary, Illinois law is settled that a product manufacturer *and its customers* do not share a fiduciary or special relationship, much less a product manufacturer *and its customer's employees*. *See, e.g.*, *Flynn v. FCA US LLC*, 327 F.R.D. 206, 218 (S.D. Ill. 2018); *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584 (Ill. 1996). Plaintiffs' fraud by non-disclosure claim fails accordingly.

*Fifth*, Plaintiffs' negligence and negligent misrepresentation claims are separately barred by the economic loss doctrine. Plaintiffs seek to recover for purely economic injury due to lost income and flying time in the wake of the 737 MAX grounding, but courts in Illinois have long prohibited such claims for monetary injury that sound in negligence. *See, e.g.*, *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 450-51 (Ill. 1982). None of the narrow exceptions to the economic loss doctrine applies here because neither Plaintiffs nor their property were physically harmed by the 737 MAX and because Boeing is not "in the business of supplying information" to

Plaintiffs. *Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 682 N.E.2d 45, 47–48 (Ill. 1997).

*Finally*, all of Plaintiffs' claims are preempted by the Railway Labor Act ("RLA") because resolving those claims "necessarily entails the interpretation or administration of a collective bargaining agreement." *Miller v. Sw. Airlines Co.*, 926 F.3d 898, 904 (7th Cir. 2019). Courts have dismissed claims by unionized employees for tortious interference, fraudulent misrepresentation, and negligent misrepresentation on RLA preemption grounds where, as here, resolution of those claims required the interpretation of a CBA. *See, e.g.*, *Thompson v. Am. Airlines Grp.*, 128 F. Supp. 3d 1047, 1048 (N.D. Ill. 2015); *see also Monroe v. Missouri Pac. R. Co.*, 115 F.3d 514 (7th Cir. 1997); *Baylis v. Marriott Corp.*, 906 F.2d 874, 879 (2d Cir. 1990). Because Plaintiffs' claims hinge on interpreting their CBAs, none of those claims can go forward in federal court.

For these reasons and those that follow, the Court should dismiss the Complaint.

## BACKGROUND

Plaintiffs seek to represent a putative class of 17,000 flight attendants employed by Southwest Airlines. Compl. ¶ 1. Plaintiffs do not allege that they suffered any physical injuries from the 737 MAX, nor that they encountered any defects or design flaws in the aircraft. Indeed, Plaintiffs do not even allege they were assigned to work on the 737 MAX at all. *Id.* ¶ 229. Plaintiffs instead contend that their employer, Southwest, agreed to purchase 150 737 MAX aircraft in 2011, and that a provision in their then-operative 2008 CBA required them to renegotiate the terms of that CBA before Southwest placed the 737 MAX into service. *Id.* ¶¶ 158–59. During those negotiations, Plaintiffs, "through their union" (which is not a party here), allegedly relied on Boeing's misrepresentations and omissions to "Stakeholders and the public" regarding design details of the 737 MAX, which allegedly led Plaintiffs and their union to enter into a new CBA on June 1, 2013. *Id.* ¶ 161. Plaintiffs identify four Boeing press releases prior to the execution of the 2013 CBA. *See* Compl. ¶¶ 41–42 (August 30, 2012 737 MAX launch announcement); ¶ 51 (Nov.

3, 2011 press release); ¶ 52 (Feb. 12, 2012 press release); ¶¶ 53–54 (April 11, 2012 press release). Plaintiffs also attempt to inject other, later statements by Boeing regarding the 737 MAX into their Complaint, but each of those statements came *after* Plaintiffs' union had already executed the new CBA with Southwest. *See, e.g.*, *id.* ¶ 56 (October 29, 2013 press release).[1]

Based on the four press releases, Plaintiffs broadly assert that purported misrepresentations and omissions regarding specific design elements of the 737 MAX—and how those elements differed from a prior version of the aircraft—impacted their CBA negotiations with Southwest. *Id.* ¶ 38. Plaintiffs allege that the 737 MAX incorporated a LEAP-1B engine that changed the 737 MAX's "center of gravity" and "flight handling characteristics." *Id.* ¶ 82-85. Plaintiffs further allege that a test pilot "discovered an issue with the 737 MAX's high-speed handling qualities," and that "Boeing developed a software solution, MCAS," "[t]o address the issue." *Id.* ¶ 91–93. But Plaintiffs also concede that Boeing did not reach a "firm configuration" of the 737 MAX until July 2013, *id.* ¶ 98; began the "flight testing phase in January 2016," *id.*; and settled on "a revision of the MCAS flight control logic system" by March 2016, *id.* ¶ 109.

Plaintiffs nonetheless claim that Boeing's press releases from 2011 and 2012 "did not disclose the full scope of differences between the 737 NG and the 737 MAX." *Id.* ¶ 55. And they allege that, after they had entered their 2013 CBA with Southwest, Boeing "hid[] from the FAA, operators, the public, and potential customers the safety-critical design changes on the 737 MAX

---

[1] Plaintiffs also suggest that—prior to the 2013 CBA—"Boeing's website featured a page marketing the 737 MAX legacy entitled 'The Legacy and Strength of the Boeing 737 Family,'" and that Boeing presented an "infographic to highlight the 737's extensive in-service history" addressed to "Stakeholders and the public." Compl. ¶¶ 48-49. But the website Plaintiffs cite postdates their 2013 CBA negotiations, as indicated by the fact that it contains data "as of February 2019." *See* The Boeing Company, "737 MAX Updates," https://www.boeing.com/commercial/737max/737max-legacy.page. Plaintiffs cannot have relied on the site or the image on it in 2013 because they were not published at that time. And the Court may consider the full scope of the website cited in the Complaint—not just Plaintiffs' excerpted portion of it—because the website is "a central component to the complaint." *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 675 & n.1 (7th Cir. 2009).

that did not exist in prior 737 generations." *Id.* ¶ 79. Plaintiffs claim that design flaws in that system led to the crashes of Lion Air 610 and Ethiopian Airlines Flight 302, as well as the FAA's subsequent decision to suspend 737 MAX operations. *Id.* ¶¶ 167, 178, 182. The grounding of the 737 MAX, in turn, allegedly caused the Plaintiffs to "los[e] significant income" under their CBA after Southwest changed its flight schedules. *Id.* ¶¶ 224-26. Plaintiffs trace each claim to the 2013 CBA, alleging they would not have entered into it "had they known the truth about Boeing's misrepresentations" in its 2011 and 2012 press releases. *Id.* ¶¶ 261, 282, 306, 334, 356, 377.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

### I. Plaintiffs' Claims Fail For Lack Of Proximate Cause.

Proximate cause is an element of every tort and requires that a plaintiff allege both "cause-in-fact" and "legal cause." *Phillips v. DePaul Univ.*, 19 N.E.3d 1019, 1032–33 (Ill. App. Ct. 2014); *Lewis v. Lead Indus. Ass'n*, 793 N.E.2d 869, 874 (Ill. App. Ct. 2003).[2] Cause-in-fact requires that a defendant's actions be a "but-for" cause of the plaintiff's alleged injury, *id.*, and legal cause, in turn, requires that the defendant's conduct be "so closely tied to the plaintiff's injury that he should be held legally responsible for it," *City of Chicago*, 821 N.E.2d at 1127. Here, Plaintiffs fail to

---

[2] Plaintiffs allege that "many of the omissions and acts complained of" took place in Illinois, Compl. ¶ 27, and that "a substantial part of the omissions and acts giving rise to the claims asserted occurred in" Illinois, *id.* ¶ 29. For purposes of this motion, Boeing assumes that Illinois law would apply to Plaintiffs' claims.

plead either aspect of proximate cause. Because their attenuated theory of the case underlies all of their claims, the Complaint should be dismissed in its entirety.

To begin, Plaintiffs fail to allege cause-in-fact because they do not and cannot connect Boeing's purported misrepresentations about the 737 MAX to their alleged harms. Plaintiffs rest each of their claims on the allegation that they relied on Boeing's misstatements in 2011 and 2012 about the safety and design of the 737 MAX when they entered into their CBA with Southwest in 2013. Compl. ¶¶ 261, 282, 306, 334, 356, 377.[3] As Plaintiffs allege, the only time they could have "acted in reliance on Boeing's misrepresentations by including the 737 MAX in [their] 2013 CBA," *e.g.*, Compl. ¶ 261, was when SWAFA and Southwest negotiated that CBA in 2012 through the spring of 2013, *id.* ¶¶ 158–162. According to the Complaint, however, those negotiations took place months before Boeing had even "achieved firm [design] configuration" of the 737 MAX, *id.* ¶ 98; more than a year before Boeing began ground testing of the LEAP-1B engine that is a focal point of the alleged negligence and fraud, *see id.* ¶¶ 2, 43, 45, 55, 82, 98; and more than two years before Boeing actually assembled the first 737 MAX, *id.* ¶ 98. Boeing did not purport to disclose (let alone for flight attendants to rely upon) every possible design consideration of the 737 MAX at the time of the CBA negotiations, prior to "achiev[ing] firm configuration" for the airplane and years prior to actually building and testing one. In short, Plaintiffs cannot establish cause-in-fact because, based on the allegations in the Complaint, they negotiated their CBA with Southwest and agreed to fly on the 737 MAX *before* Boeing finalized the design decisions that purportedly render false the press releases on which Plaintiffs predicate their claims. *See Phillips*, 19 N.E.3d at 1036.

For that basic reason, none of the statements identified in the Complaint that were made *after* Plaintiffs' purported reliance could have been a cause-in-fact of their decision to enter their

---

[3] To the extent Plaintiffs are attempting to assert a freestanding negligence theory unconnected to their June 1, 2013 CBA, any such claim is precluded under Illinois' economic loss rule, *see* Section V, *infra*.

June 1, 2013 CBA.  Nonetheless, the Complaint cites various news articles discussing design elements of the 737 MAX that were finalized years after Plaintiffs' decision to enter a new CBA with Southwest and years after the 2011 and 2012 press releases upon which Plaintiffs could at least conceivably have relied.  The Complaint alleges, for instance, that Boeing test pilots noticed a handling issue on the 737 MAX after flight testing began in 2016, Compl. ¶¶ 101–04; that "Boeing engineers scrambled to find a fix" and that, "[b]y March 2016, Boeing settled on a revision of the MCAS flight control logic system," *id.* ¶¶ 108–09, which "gave MCAS enough authority to autonomously move the aircraft tail's horizontal stabilizer to the full nose-down limit" and "introduced the risk" that allegedly led to the two accidents, *id.* ¶¶ 116–17.  Plaintiffs further allege that Boeing hid this revised version of MCAS from the FAA beginning in 2016, *id.* ¶¶ 118–21; that "[b]ased on the false representation" regarding revised MCAS "[t]he FAA incorrectly classified the MCAS" risk category, *id.* ¶ 123; and that the 737 MAX, including revised MCAS, achieved certification in 2017 because of these alleged omissions and misrepresentations, *id.* ¶ 135.  None of these allegations, however, are relevant to Plaintiffs' decision to enter into a CBA three to four years earlier when the 737 MAX did not even have a firm design configuration.

As a matter of law and logic, a plaintiff cannot rely on statements made by a defendant after the time of the purported reliance.  The Illinois Appellate Court recognized this commonsense principle in *Phillips v. DePaul University*, where it dismissed fraud claims by law students who alleged that they relied on false post-graduation employment statistics in deciding to enroll in part because some of the plaintiffs enrolled "prior to the publication of the employment information" they asserted was false. 19 N.E.3d at 1036.  That principle controls here.  Plaintiffs allege that Boeing's 2011 and 2012 press releases did not "disclose the full scope of differences between the [predecessor] 737 NG and the 737 MAX."  Compl. ¶ 55.  But Plaintiffs' claims fail because the

737 MAX design (and, by extension, the "full scope of differences" between the aircraft and its predecessor) had not yet been finalized when the press releases were issued—and indeed were not yet finalized at the time Plaintiffs entered into their CBA with Southwest on June 1, 2013. This timeline precludes a finding of cause-in-fact and requires dismissal of Plaintiffs' claims.

Even if Plaintiffs could plead cause-in-fact, their alleged injuries are far too remote from Boeing's alleged conduct to establish legal causation. Plaintiffs do not allege any connection to any incident involving a 737 MAX, and their alleged injuries are many steps—and many years— removed from the press releases that purportedly give rise to their claims. Settled Illinois and Seventh Circuit precedent bars attenuated claims such as these, where a third party with no relationship to an accident nonetheless "claims harm as a result of injury to the person or property of another." *Dundee Cement Co. v. Chem. Labs, Inc.*, 712 F.2d 1166, 1168 (7th Cir. 1983); *Kraft Chem. Co. v. Ill. Bell Tel. Co.*, 608 N.E.2d 243, 246 (Ill. App. Ct. 1992). Allowing flight attendants to recover the "expected benefits" from a CBA they negotiated and agreed upon years before the final design, certification, and production of the 737 MAX would "repeal th[is] rule," *Dundee*, 712 F.2d at 1171, and "extend potential liability to a class virtually as large as the public," *Roman v. Delta Air Lines*, 441 F. Supp. 1160, 1168 (N.D. Ill. 1977); *see also Dundee*, 712 F.2d at 1172 ("The multiversant possibilities of such litigation are staggering to the imagination").

Courts in Illinois have consistently rejected remote theories of harm built on these types of attenuated causal chains. *See, e.g.*, *Roman*, 441 F. Supp. at 1168 (plaintiffs relying on Delta's public marketing statements were "in a position too remote to be eligible to recover from defendant for any misrepresentation made"); *Cty. of Cook v. Philip Morris*, 817 N.E.2d 1039, 1048 (Ill. App. Ct. 2004) (county's claims for healthcare costs against product manufacturer were "correctly dismissed on the basis of the remoteness doctrine"); *Kraft Chem. Co.*, 608 N.E.2d at 246

(dismissing tort claims by plaintiffs who could not use telephone after contractor severed fiber optic cable). Connecting Plaintiffs' injuries to Boeing's alleged conduct requires at least eight causal steps and numerous intervening actors: (1) Plaintiffs—"through their union"—relied on alleged misrepresentations and omissions regarding the design of the 737 MAX in entering into a CBA, Compl. ¶¶ 161, 261, 282, 298, 306–308, 314, 317, 356, 369, 377; (2) Boeing thereafter negligently designed the 737 MAX, *id.* ¶¶ 85–93; (3) Boeing did not train pilots regarding a 737 MAX design feature that could affect flight under certain circumstances, *id.* ¶¶ 174, 276, 277, 283, 292, 320, 344; (4) pilots affected by this design feature could not control it, *id.* ¶¶ 168, 179 ; (5) two accidents ensued, in Indonesia and Ethiopia, *id.* ¶¶ 167–79; (6) regulators grounded the 737 MAX, *id.* ¶¶ 180–84; (7) the grounding led Southwest to modify its flight schedules, *id.* ¶ 210; and (8) these modified schedules altered "SWAFA's expected benefits from its CBA," *id.* ¶¶ 263, 308, 336, resulting in Plaintiffs' financial harm, *id.* ¶¶ 165, 265, 284, 311, 339, 358, 379. There is no precedent for allowing recovery on such a complex and indirect theory of harm. *Cty. of Cook*, 817 N.E.2d at 1048 (dismissing fraud claim on remoteness grounds "given the derivative nature of the injuries alleged"); *Roman*, 441 F. Supp. at 1168 (same); *Phillips*, 19 N.E.3d at 1036 (same).[4]

Plaintiffs also fail to allege proximate cause for an additional reason: their economic injuries from the grounding of the 737 MAX were not a foreseeable risk of Boeing's representations or omissions concerning the airplane's early design concept in 2011 and 2012.

---

[4] The Seventh Circuit has also noted that derivative theories of liability are disfavored because they create a risk of double recovery by the plaintiffs. *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818, 825 (7th Cir. 1999) (dismissing complaint where "injury for which the plaintiffs seek compensation is remote indeed, the chain of causation long, the risk of double recovery palpable"). That risk of double recovery is quite "palpable" here, where Southwest and Boeing have already reached a settlement for some of Southwest's claims relating to the 737 MAX grounding, and Southwest has allocated $124 million from those settlement proceeds to its employees, including those (like flight attendants) potentially impacted by the grounding. *See* Ex. A, Southwest Airlines Co., SEC Form 10-K (Feb. 4, 2020) at 40. The court may take judicial notice of Southwest's securities filings describing this settlement. *See, e.g.*, *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1155 n.1 (N.D. Ill. 2004).

*See, e.g.*, *Cty. of Cook*, 817 N.E.2d at 1047 ("[F]oreseeability and direct injury (or remoteness) are distinct concepts, both of which must generally be established by the plaintiff."). Plaintiffs allege that "Boeing knows" how Southwest staffs flights, pays flight attendants, and sets its flight schedule, and therefore that "Boeing knew the impact that its conduct, including its omissions about the design of the 737 MAX, would have on Plaintiffs." Compl. ¶¶ 148–50. But Plaintiffs have alleged nothing that would establish Plaintiffs' economic harms were the "likely result" of Boeing's press releases in 2011 and 2012, as required to demonstrate proximate cause. *First Springfield Bank & Tr. v. Galman*, 720 N.E.2d 1068, 1073 (Ill. 1999). Courts in Illinois are clear that "'[f]oreseeability' means that which it is objectively reasonable to expect, not merely what might conceivably occur." *Benner v. Bell*, 602 N.E.2d 896, 899 (Ill. App. Ct. 1992); *see also Galman*, 720 N.E.2d at 1073 ("The relevant inquiry here is whether the injury is of a type that a reasonable person would see *as a likely result* of his or her conduct."); *Aquino v. C.R. Bard, Inc.*, 413 F. Supp. 3d 770, 794 (N.D. Ill. 2019) (dismissing negligence claim for lack of foreseeability). Even if the lengthy and attenuated causal chain that Plaintiffs allege was "conceivable," it was not "objectively reasonable to expect." *Benner*, 602 N.E.2d at 899.[5]

Nor is it enough for Plaintiffs to tack on a conclusory allegation that their economic injuries were "reasonably foreseeable" when Boeing designed the 737 MAX because Boeing was "selling an aircraft it knew violated Federal Aviation Regulations" and would "likely … be grounded." Compl. ¶¶ 222, 280. That allegation fails three times over. As noted above, the allegation is illogical because it is predicated on design and development decisions finalized long after the press releases on which Plaintiffs allegedly relied. Moreover, it is based on the implausible premise that

---

[5] It bears mention that the grounding of an entire aircraft model is an extremely rare event. There are few historical precedents, and Plaintiffs cite none in support of their claim that a grounding was reasonably foreseeable. To the contrary, Plaintiffs emphasize that the 737 NG, the MAX's predecessor, was "widely flown and time-tested," Compl. ¶ 38, and cite evidence that it "has carried 30 billion passengers," *id.* ¶ 49.

Boeing, whose business depends on the safety of its products, would knowingly and intentionally design an unsafe airplane. In all events, the allegation is legally insufficient because "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Because plaintiffs' injuries "were not foreseeable consequences of their decisions to" enter the 2013 CBA "in reliance on" Boeing's alleged representations regarding the 737 MAX in 2011 and 2012, "plaintiffs failed to adequately plead legal causation." *Phillips*, 19 N.E.3d at 1034. For these reasons, Plaintiffs' claims fail for lack of proximate cause.

## II.    Plaintiffs Fail To Plead The Requisite Elements Of Tortious Interference.

Plaintiffs' claims for tortious interference with contractual rights and relationship (Count III) and tortious interference with an existing business relationship (Count IV) also fail as a matter of law. As a threshold point, the two causes of action are closely related. To state a claim for tortious interference with a contract under Illinois law, a plaintiff must plead: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *HPI Health Care Servs. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989). To state a claim for tortious interference with a business relationship, a plaintiff must plead "(1) the existence of a valid business relationship (not necessarily evidenced by an enforceable contract) or expectancy; (2) the knowledge of the relationship or expectancy on the part of the interferer; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Am. Guardian Warranty Servs. v. Auto Prot. Corp.*, 2019 WL 6130813, at

*2-3 (N.D. Ill. Nov. 19, 2019).[6] Here, both of Plaintiffs' tortious interference claims fail because Plaintiffs do not allege the third element of each cause of action: an intent to induce a breach of the relationship between Plaintiffs and Southwest, whether contractual or otherwise. Boeing's press releases—issued to the public at large and containing only generalized information about the 737 MAX years before its entry into service—do not demonstrate such intent as a matter of law. And in all events, Plaintiffs cannot allege that there was a breach of their relationship with Southwest, since each Plaintiff still flies for Southwest under the 2013 CBA.[7]

Plaintiffs fail to allege intent because the very nature of the statements they identify—early stage press releases issued to the general public introducing and announcing progress on a new airplane model—do not meet the requirement that Boeing's actions be *directed* at Plaintiffs' relationship with Southwest. Plaintiffs do not allege any direct communication between Boeing and Southwest or any of its flight attendants during CBA negotiations, much less that such a communication actually disrupted Plaintiffs' relationship with Southwest. Indeed, Plaintiffs come nowhere close to satisfying Illinois's standard for alleging "intent to induce," which "requires some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way." *Webb*, 906 F.3d at 579. At no point do Plaintiffs identify any communication

---

[6] While the requisite elements of the two torts are quite similar, they differ in a manner not relevant here based on "the degree of enforceability of [the] business relationship." *Belden Corp. v. InterNorth, Inc.*, 413 N.E.2d 98, 102 (Ill. App. Ct. 1980). "[W]hile interference with a business expectancy in the absence of a binding contract may be privileged where it subserves business competition, interference that induces a breach of contract where there is a binding contract is not so privileged." *Film & Tape Works, Inc. v. Junetwenty Films, Inc.*, 856 N.E.2d 612, 618 (Ill. App. Ct. 2006). This distinction is more appropriately considered in a traditional tortious interference claim against a competitor and does not readily apply here.

[7] Although by its terms the 2013 CBA extended through October 31, 2018, CBAs governed by the RLA "do not expire on their expiration dates." *See, e.g., Air Line Pilots Ass'n v. UAL Corp.*, 897 F.2d 1394, 1398 (7th Cir. 1990). Instead, they become "amendable" and "continue[] in force" unless and until a new CBA is finalized. *Id.* Because Southwest has yet to conclude a new CBA with its flight attendants, the 2013 CBA is still in force. *See* Ex. A, Southwest Airlines Co., SEC Form 10-K (Feb. 4, 2020) at 19 (explaining that Southwest remains "in negotiations" with its flight attendants).

directed to anyone more specific than an amorphous group of "Stakeholders." "It is not enough for the defendant's action to impact a third party; rather, the defendant's action must be *directed towards* the third party." *Boffa Surgical Grp. LLC v. Managed Healthcare Assocs.*, 47 N.E.3d 569, 577 (Ill. App. Ct. 2015) (emphasis added). As such, Plaintiffs fail to allege the requisite intent to breach Plaintiffs' relationship with Southwest. *See, e.g.*, *Premier Transport, Ltd. v. Nextel Commc's, Inc.*, 2002 WL 31507167, at *2 (N.D. Ill. Nov. 12, 2002) ("[T]here is a long line of cases—both from the Illinois appellate courts and from federal courts within this district— explaining that the element of interference requires more than mere allegations of conduct between the plaintiff and defendant. Rather, a plaintiff must assert that there has been interference as a result of conduct directed by the defendant toward a third party.") (collecting cases).[8]

Plaintiffs' tortious interference claims also fail because they do not allege a breach of any relationship. Plaintiffs nowhere allege a breach of the 2013 CBA, and that failure alone warrants dismissal of Plaintiffs' tortious interference with contract claim. *See, e.g.*, *Strosberg v. Brauvin Realty Servs.*, 691 N.E.2d 834, 845 (Ill. App. Ct. 1998) ("[I]n order to establish that tort, there must be evidence of a breach of contract caused by the defendant."); *Webb*, 906 F.3d at 577. The same failure of pleading also warrants dismissal of Plaintiffs' business relationship claim, as Plaintiffs do not allege that their relationship with Southwest was actually breached or terminated. While Plaintiffs make conclusory allegations that Boeing's actions interfered with their "expected benefits from their … business relationship with Southwest," Compl. ¶ 336, they fall well short of alleging the necessary "breach or termination" of that relationship required to state a tortious

---

[8] *See also, e.g.*, *D&K Props. Crystal Lake v. Mut. Life Ins. Co.*, 1996 WL 224517, at *8 (N.D. Ill. May 1, 1996) (granting motion to dismiss where plaintiff alleged only that defendant's "acts had an *impact on* the [third-party], not that the acts were *directed* at the [third-party]"); *Willcutts v. Galesburg Clinic Ass'n*, 560 N.E. 2d 1, 4 (Ill. App. Ct. 1990) (affirming dismissal of tortious interference claim where plaintiff "failed to allege specific actions by defendants directed at third parties, but rather … presented broad, conclusory allegations").

14

interference claim, *Rubloff Dev. Grp. v. SuperValu, Inc.*, 863 F. Supp. 2d 732, 747 (N.D. Ill. 2012). Indeed, Plaintiffs concede that they remain employed by Southwest to this day, Compl. ¶¶ 17-25, and continue to fly under the 2013 CBA. Plaintiffs thus cannot state a tortious interference claim.

## III. Plaintiffs' Fraud Allegations Fail Under Illinois Law and Rule 9(b).

Plaintiffs fail to plausibly allege the prerequisites of fraud under Illinois law. To state a fraud claim, Plaintiffs must allege with particularity: "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance upon the truth of the statement; and (5) damage to the plaintiff resulting from such reliance." *Toulon*, 877 F.3d at 734. "Threadbare recitals of the elements of [fraud] supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Here, Plaintiffs' fraudulent misrepresentation claim is predicated on four generalized press releases made at a time when the 737 MAX design was not finalized. Plaintiffs do not and cannot plausibly allege that any of these press releases is false, that Plaintiffs actually relied upon them when negotiating the 2013 CBA, or that Boeing intended such reliance. None of the post-CBA allegations in the Complaint, moreover, is pleaded with particularity, and none could have been relied upon by Plaintiffs or their union because they had already agreed to fly the 737 MAX at the time those statements were made. Plaintiffs' fraud claims thus fail as a matter of law.

*First*, Plaintiffs fail to plead fraudulent misrepresentation because they fail to allege that any relevant statement by Boeing was actually "a false statement of material fact." *Toulon*, 877 F.3d at 734. Plaintiffs contend, for instance, that Boeing misled Stakeholders by touting the 737 NG's reliability, *id.* ¶ 49, and by stating that the 737 MAX "optimizes Boeing's knowledge," *id.* ¶ 41. They further allege that Boeing misrepresented the 737 MAX as "a new engine variant" that "builds on the strengths of today's NEXT-Generation 737," *id.* ¶ 52, and that new technologies would offer "substantial benefits to … customers with minimal risk," *id.* ¶ 54. But Illinois law is

15

clear that vague, forward-looking predictions and statements of opinion—such as these statements from Boeing press releases, which were the only representations pled from prior to Plaintiffs' CBA negotiations—are not actionable misrepresentations as a matter of law. *See, e.g.*, *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 847 (Ill. 2005) ("Describing a product as 'quality' or as having 'high performance criteria' are the types of subjective characterizations that Illinois courts have repeatedly held to be" non-actionable "as a matter of law."); *Abazari v. Rosalind Franklin Univ. of Med.*, 40 N.E.3d 264, 273 (Ill. App. Ct. 2015) ("[P]rojections of future performance are generally not actionable as false statements, because they are considered opinions rather than statements of present or preexisting fact.").

Moreover, Plaintiffs do not and cannot demonstrate how any of these statements—even if they were actionable—were false at the time they were made. Plaintiffs do not take issue with the truthfulness of the actual language found in the four press releases. Rather, their complaint focuses on what the press releases *do not* say, making the conclusory allegation that "Boeing did not disclose the full scope of differences between the 737 NG and the 737 MAX." *Id.* ¶ 55. Plaintiffs ignore, however, that each of the press releases was clear that the 737 MAX was still in its design phase, and it was thus impossible for Boeing to disclose "the full scope of differences" at that time. *See, e.g.*, *id.* ¶ 51 (November 3, 2011 press release noting that "[t]he program is on schedule with internal configuration milestones of the new jet" and "[f]irm configuration for the airplane is scheduled for 2013"); ¶ 53 (April 11, 2012 press release noting that "[w]e also continue to do work in the wind tunnel" and referring to "preliminary testing results").[9] Plaintiffs also fail to plead that any of these early press releases—which plainly highlight a mere sample of high-level characteristics of the airplane—purport to represent *all* of the possible design characteristics of the

---

[9] These examples are taken directly from the press releases cited in the Complaint at ¶¶ 51 n.10 and 53 n.12.

737 MAX. At bottom, Plaintiffs' objections to the four press releases are nothing more than conclusory allegations of fraudulent *omission*, which are deficient on their face and also fail to state a claim because, as discussed in Part IV, *infra*, Plaintiffs cannot establish the requisite fiduciary or extremely similar relationship with Boeing that could give rise to such a claim. Because Plaintiffs fail to allege that any of the statements found in the pre-2013 press releases were actually false, they necessarily fail to plead fraudulent misrepresentation under Illinois law.

*Second*, Plaintiffs do not plausibly allege that Boeing acted with the requisite intent to induce Plaintiffs to enter into a new CBA. *Toulon*, 877 F.3d at 734. Plaintiffs' intent allegations are purely conclusory: "Boeing made the foregoing omissions and misrepresentations with the intent to induce Stakeholders and the public to rely on the representations." Compl. ¶ 352. Yet Plaintiffs fail to explain how Boeing intended to induce SWAFA to enter a CBA with Southwest by concealing design elements of the 737 MAX at a time when the design was still in development. Nor do they plead how Boeing could have harbored this intent to induce Plaintiffs through general press releases addressed only generally to "Stakeholders and the public." *See Roman*, 441 F. Supp. at 1168 (rejecting fraud claim based on plaintiffs' reliance on public advertising). Furthermore, Plaintiffs do not plead that any *individual* at Boeing intended to induce their reliance through the 2011 and 2012 press releases, as required by Illinois law, but only vaguely ascribe the requisite intent to "Boeing." *See C&K Nuco, LLC v. Expedited Freightways, LLC*, 2016 WL 3364766 at *10 (N.D. Ill. June 17, 2016) (noting Illinois does not consider "collective corporate intent" in evaluating fraud claims). Plaintiffs rest on speculation about what "Boeing knew or should have known" about flight attendants' reliance ("through their union") when issuing press releases in the design development stage of the 737 MAX. Compl. ¶¶ 161, 163. But that allegation fails to address the *intent* of any individual Boeing employee, which is necessary to establish a fraud claim.

17

*Third*, as discussed in Part I, *supra*, Plaintiffs do not adequately allege that they relied on any of these four statements when entering into their CBA. Rather than pleading the details of Plaintiffs' reliance on any particular representation and how that reliance impacted their 2013 CBA negotiations, Plaintiffs "merely provided a conclusory statement that the representation was relied upon." *Shermer Aviation, LLC v. Dassault Falcon Jet Corp.*, 2014 IL App (1st) 131400-U, ¶ 26 (affirming dismissal of fraudulent misrepresentation claim against airplane manufacturer where plaintiffs "failed to allege facts demonstrating their reliance on the misrepresentation"). Indeed, even the most detailed allegations of reliance state only that Plaintiffs—"through their union"—entered into their CBA with Southwest in 2013 "[b]ased upon" the four press releases "made by Boeing to Stakeholders and the public." ¶ 161. But Plaintiffs do not plead any facts showing that either they or their union reviewed the press releases before finalizing the CBA—or were even aware of them—nor do they explain how they or their union's decisions to approve the CBA was "based upon" four generalized press releases made before a firm configuration of the 737 MAX had been established. *See Phillips*, 19 N.E.3d at 1036; *Reid v. Harvey Motorcycle & Camper*, 2007 WL 4277435, at *6 (N.D. Ill. Nov. 30, 2007) (dismissing fraud claim because plaintiff could not "demonstrate that he entered into a transaction in reliance on [defendant's] fraudulent statements and suffered damages as a result of his reliance"). And, as a matter of law, there is no way that Plaintiffs can demonstrate that the alleged misrepresentations and omissions made after June 1, 2013 impacted their CBA negotiations.

These fundamentally deficient fraud allegations in Plaintiffs' Complaint do not come close to satisfying the heightened pleading standards of Rule 9(b), which prohibit "vague and general" allegations of fraud and instead demand "that plaintiffs must plead the circumstances constituting fraud in detail—the 'who, what, when, where, and how.'" *McMahan v. Deutsche Bank AG*, 938

F. Supp. 2d 795, 804 (N.D. Ill. 2013). Here, while Plaintiffs at least quote portions of four press releases, they admit that the quoted statements were made to "Stakeholders and the public" without alleging that any Plaintiff read them at any particular time, or how the particular substance of any of those press releases affected their collective bargaining negotiations in 2012 and 2013. And because Plaintiffs do not allege that they even heard, much less relied upon, any of the Complaints' post-CBA representations and alleged omissions, none of those allegations meets the heightened pleading requirements of Rule 9(b) or Illinois law.

## IV. Plaintiffs' Fraud By Non-Disclosure Claim Separately Fails Because Boeing Does Not Have A Fiduciary Or "Extremely Similar" Relationship With Flight Attendants.

At base, all of Plaintiffs' fraud and misrepresentation allegations are based on the same theory that Boeing failed to disclose information to them and that omission caused them harm. These fraud by non-disclosure arguments fail for the separate reason that Boeing does not share the unique relationship with flight attendants required in order to give rise to a disclosure duty under Illinois law.[10] "To prove fraud by the omission of a material fact, it is necessary to show the existence of a special or fiduciary relationship, which would raise a duty to speak." *Al Maha Trading & Contracting Holding Co. v. W.S. Darley & Co.*, 936 F. Supp. 2d 933, 945–46 (N.D. Ill. 2013). "[S]tate and federal courts in Illinois have rarely found a special trust relationship to exist in the absence of a more formal fiduciary one." *Wigod*, 673 F.3d at 571; *Toulon*, 877 F.3d at 738.

Plaintiffs do not plead that Boeing and flight attendants share anything akin to a fiduciary or similar relationship. Plaintiffs were not in privity with Boeing; in fact, Plaintiffs do not allege that they had *any* specific relationship with Boeing whatsoever, or even any direct communication

---

[10] Illinois law does not recognize "fraud by non-disclosure" as separate from fraudulent concealment, and the Seventh Circuit has used the two terms interchangeably. *See Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 397 (7th Cir. 2009) (noting plaintiff's "allegations amount to a claim of fraudulent concealment or fraud-by-nondisclosure" and affirming dismissal of claim for failure to establish duty to disclose).

with Boeing during their CBA negotiations. Instead, they cast themselves as one part of a group of "Stakeholders" and assert that "Boeing had a legal duty to speak, and to inform Stakeholders and the public concerning the differences between the 737 NG and 737 MAX," *id.* ¶ 255. But no Illinois authority suggests that a product manufacturer shares a fiduciary or special relationship with such a broad class of persons, much less the entire public who may encounter its product. To the contrary, Illinois law is settled that even a product manufacturer and its customers do not share a special or fiduciary relationship, even where the customer places trust in the product and there are information asymmetries between the parties. *Flynn*, 327 F.R.D. at 218 (buyers and users of allegedly defective vehicles cannot state fraudulent omission claim against manufacturer because there is no "fiduciary or special trust relationship" between them); *Connick*, 675 N.E.2d at 593 (same); *Go For It, Inc. v. Aircraft Sales Corp.*, 2003 WL 21504600, at *2 (N.D. Ill. June 27, 2003) (buyer and seller of aircraft did not share "confidential or fiduciary relationship" even though seller possessed superior knowledge of aircraft). Because Boeing's *customers* do not have a special relationship with Boeing as a matter of law, it necessarily follows that the *employees* of a customer do not have such a relationship. There is no basis in Illinois law to support a finding of a fiduciary or extremely similar relationship under these circumstances.

Plaintiffs refer in an argument header to their trust in Boeing, Compl. § II.B, but allegations of trust are insufficient to establish a fiduciary or extremely similar relationship. *See, e.g.*, *Benson v. Stafford*, 941 N.E.2d 386, 398 (Ill. App. Ct. 2010) ("The fact that one party trusts the other is insufficient to establish a fiduciary relationship."); *Connick*, 675 N.E.2d at 593. Nor do allegations of "special knowledge," Compl. ¶ 254, "show the degree of dominance needed to establish a special trust relationship." *Wigod*, 673 F.3d at 573; *Connick*, 675 N.E.2d at 593; *Go For It, Inc.*, 2003 WL 21504600, at *2. Because the Complaint fails to allege facts substantiating the fiduciary

20

or "extremely similar" relationship that is required under Illinois law to state a fraud by non-disclosure claim, *Wigod*, 673 F.3d at 572, Plaintiffs' claim should be dismissed.

**V.      The Economic Loss Doctrine Bars Plaintiffs' Negligence Claims.**

Plaintiffs' negligence and negligent misrepresentation claims are separately foreclosed by the economic loss doctrine.  It is well settled a plaintiff "cannot recover for solely economic loss" under a theory of negligence.  *Moorman*, 435 N.E.2d at 453; *Westfield Ins. Co. v. Birkey's Farm Store*, 924 N.E.2d 1231, 1242 (Ill. App. Ct. 2010); *see also Orchard Park Plaza, LLC v. Chubb Custom Ins.*, 2018 IL App (1st) 172526-U, ¶ 40 (applying economic loss doctrine to negligent misrepresentation claim).  This rule "avoids the consequences of open-ended tort liability," *In re Chicago Flood Litig.*, 680 N.E.2d 265, 274 (Ill. 1997), by prohibiting "economic losses occasioned by diminished commercial expectations not coupled with injury to person or property," *In re Ill. Bell Switching Station Litig.*, 641 N.E.2d 440, 443 (Ill. 1994).  Plaintiffs here do not allege they were harmed in a 737 MAX accident or by any alleged defect in the aircraft but nevertheless seek "lost income" following the 737 MAX grounding.  Compl. ¶¶ 7, 284, 379.  Such "damages for inadequate value … or consequent loss of profits—without any claim of personal injury or damage to other property"—are textbook economic losses foreclosed by the economic loss doctrine. *Moorman*, 435 N.E.2d at 449; *see also Anderson Elec. v. Ledbetter Erection Corp.*, 503 N.E.2d 246, 249 (Ill. 1986) (economic losses include "defeated expectations of a commercial bargain").

As Justice Holmes recognized nearly 100 years ago: "The law does not spread its protection so far" as to allow recovery in tort for economic injury standing alone.  *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 309 (1927) (dismissing tort claims by charterer of a ship against dry dock company when its negligence delayed the ship's return to service).  If flight attendants thousands of miles away from two 737 MAX accidents could recover their economic losses from the aircraft manufacturer (rather than their own employer), there would be no logical stopping

21

point, because "the economic consequences of any single accident are virtually limitless." *In re Chicago Flood*, 680 N.E.2d at 274; *see also E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 874 (1986) ("[I]f the charterers—already one step removed from the transaction— were permitted to recover their economic losses, then the companies that subchartered the ships might claim their economic losses from the delays, and the charterers' customers also might claim their economic losses, and so on."). The law accordingly prohibits claims like Plaintiffs', which allege only economic injury downstream from accidents in which they were not physically injured.

Nor can Plaintiffs proceed under an exception to the economic loss rule. Illinois recognizes "three exceptions": "(1) where the plaintiff sustains damage, *i.e.*, personal injury or property damage, resulting from a sudden or dangerous occurrence; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation; and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions." *Trans States Airlines*, 682 N.E.2d at 47–48. None of those exceptions applies to Plaintiffs' negligence claims.

*First*, Plaintiffs' claims do not fall within the exception for "personal injury or property damage resulting from sudden or dangerous occurrence" because Plaintiffs do not allege that they sustained "personal injury or property damage" in the first place. *Id.* And Plaintiffs cannot save their claims by arguing that the 737 MAX accidents were themselves "sudden or dangerous" because the exception requires a nexus between the sudden or dangerous occurrence and the plaintiffs' personal injury or property damage. *See, e.g.*, *Chicago Flood*, 680 N.E.2d at 275 ("[T]he exception is composed of a sudden, dangerous, or calamitous event coupled with personal injury or property damage."). Plaintiffs do not and cannot allege that type of nexus here.

*Second*, Plaintiffs' negligence and negligent misrepresentation claims are not exempt from

22

the economic loss rule merely because Plaintiffs also allege intentional misrepresentation. *See Wigod*, 673 F.3d at 568–69 (dismissing negligence claim under *Moorman* and separately dismissing fraudulent misrepresentation and concealment claims). Were it otherwise, the second exception would swallow the broader economic loss rule, and any plaintiff could undermine the rule simply by tacking on claims of fraud or tortious interference. Illinois law holds the opposite.

*Third*, the narrow exception for defendants "in the business of supplying information for the guidance of others in their business dealings" also does not apply. *Tolan & Son, Inc. v. KLLM Architects, Inc.*, 719 N.E.2d 288, 296 (Ill. App. Ct. 1999). This exception encompasses information providers whose "end product *was* the ideas," *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 823 N.E.2d 168, 178 (Ill. App. Ct. 2005) (emphasis added), not product manufacturers whose "end-product" is a "tangible good," such as an airplane. *See Jett8 Airlines, PL v The Boeing Co.*, 2012 WL 5815728 (Ill. Cir. Ct. Nov. 02, 2012), *aff'd sub nom. Jett8 Airlines, PL v. Gen. Elec. Co.*, 2014 IL App (1st) 131816-U, ¶ 1 (unpublished opinion). Indeed, an Illinois court has already considered and rejected the assertion that Boeing is "in the business of supplying information" because any information it provides—"operation and maintenance manuals, service bulletins and other communications"—is "merely ancillary to the tangible good," an airplane. *Id.*; *see also Rankow v. First Chicago Corp.*, 870 F.2d 356, 364 (7th Cir. 1989) (exception does not apply to businesses that provide information as well as tangible products, such as "manufacturers provid[ing] operating or assembly instructions," because the product "is not itself information, . . . the information provided is merely incidental").

Illinois law is clear that while tort law protects against physical harm and property damage, manufacturers are not liable for "damages of unknown and unlimited scope." *Moorman*, 435 N.E. 2d at 447. Instead, "[t]he remedy for economic loss … lies in contract." *Id.* at 450.

Counts II and VI therefore fail as a matter of law.

## VI.    Plaintiffs' Claims Are Preempted By The Railway Labor Act.

Finally, the Railway Labor Act ("RLA") bars this suit in its entirety because adjudicating each of Plaintiffs' claims will necessarily require interpretation of the 2013 and 2008 CBAs. Compl. ¶ 158.  All disputes concerning the making, interpretation, or application of airline industry CBAs are governed by the RLA.  *See* 45 U.S.C. § 181, 184–85.  Under that statute, "if a dispute necessarily entails the interpretation or administration of a collective bargaining agreement, there's no room for individual employees to sue under state law—in other words, state law is preempted." *Miller*, 926 F.3d at 904 (7th Cir. 2019).  The RLA's jurisdictional bar applies regardless of whether the defendant in a lawsuit is a signatory to the collective bargaining agreement.  *See, e.g.*, *Baylis*, 906 F.2d at 875-76 (applying RLA preemption in favor of a nonparty to a contract).  Indeed, RLA preemption is "not confined to state claims made by parties to the labor relationship," and "third-party claims may also be preempted, because they similarly threaten the balance of labor-management relations."  *Kaufman v. Allied Pilots Ass'n*, 274 F.3d 197, 201 (5th Cir. 2001) (applying preemption principles from *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959), to claims involving third parties).

Courts have dismissed claims by flight attendants under theories of tortious interference, fraudulent misrepresentation, and negligent misrepresentation where, as here, their resolution required the interpretation of a CBA.  *See, e.g.*, *Thompson*, 128 F. Supp. 3d at 1048.  Likewise, multiple courts of appeals have held that claims of tortious interference are preempted by the RLA under circumstances in which "[o]nly by interpreting a contract can a court determine whether the contract has been breached."  *Int'l Union, United Mine Workers of Am. v. Covenant Coal Corp.*, 977 F.2d 895, 895-96. (4th Cir. 1992); *see, e.g.*, *Milne Emps. Ass'n v. Sun Carriers*, 960 F.2d 1401, 1412 (9th Cir. 1991) ("a court could not determine whether [defendants] induced a breach of the

employees' contracts with [third party] without construing the terms of the underlying contracts");
*Baylis*, 906 F.2d at 877. Courts interpreting the Labor Management Relations Act ("LMRA") have likewise reached the same result, as the RLA and LMRA pre-emption standard is "virtually identical." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 260 (1994). For example, in *Kimbro v. Pepsico, Inc.*, the Seventh Circuit held that the LMRA preempted a tortious interference claim because the claim required the plaintiff to prove that his employer breached a CBA. *See* 215 F.3d 723, 727 (7th Cir. 2000). The same result should obtain here, and the Complaint should be dismissed in its entirety for lack of subject matter jurisdiction under Rule 12(b)(1).

There is no doubt that resolving each of Plaintiffs' claims would require the Court to interpret and apply the terms of SWAFA's CBAs. Indeed, Plaintiffs conceded in their Response to Boeing's Motion for Reassignment that "[t]he SWAFA union and Collective Bargaining Agreement with Southwest" are "[m]aterial facts that are pertinent to the SWAFA Case." Case No. 1:19-cv-05008, Dkt. 135, at 6. And Plaintiffs contend in all six counts of their Complaint that Boeing's actions or omissions affected the terms of the 2013 CBA and its negotiation and drafting process. Compl. ¶¶ 262–63, 282, 298, 306, 334, 356, 377. These allegations confirm that Plaintiffs' claims are intertwined with the 2013 CBA and are thus preempted under the RLA.

Plaintiffs' alleged damages, moreover, stem from their "expected benefits" from particular terms that were changed from the 2008 CBA to the 2013 CBA. *See id.* ¶¶ 263, 308, 336. In order for the Court to evaluate those "expected benefits," it will have to compare the 2008 CBA to the 2013 CBA and determine what, if any, terms changed and how those terms may have affected Plaintiffs after Southwest altered its flight schedules following the 737 MAX grounding. That analysis squarely implicates the terms of both CBAs and thus falls within the scope of the RLA.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint with prejudice.

Dated:  August 10, 2020

Respectfully submitted,

*/s/ Michael B. Slade*
Michael B. Slade (6274231)
Allison A. Ray (6309970)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
(312) 862-2000

Craig S. Primis, P.C.
Ronald K. Anguas, Jr.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000

*Attorneys for Defendant The Boeing Company*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on August 10, 2020, he electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system and personally served opposing counsel (listed below) by e-mail to:

Marvin A. Miller
Andy Szot
MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, Illinois 60603
mmiller@millerlawllc.com
aszot@millerlawllc.com

Seth A. Katz
Michael Mauro
BURG SIMPSON ELDREDGE
HERSH & JARDINE, P.C.
40 Inverness Drive East
Englewood, CO 80112
Tel: 303-792-5595
Fax: 303-708-0527
skatz@burgsimpson.com
mmauro@burgsimpson.com

Bradley R. Irwin
Roger D. Fraley, Jr.
Ken Falkenstein
IRWIN FRALEY, PLLC
7377 S. Revere Parkway, Suite 400
Centennial, CO 80111
Tel: 303-999-9000
Fax: 303-999-9001
birwin@coloradolawyers.com
rfraley@coloradolawyers.com
kfalkenstein@coloradolawyers.com


*/s/  Michael B. Slade*
Attorney for The Boeing Company